UNITED STATES of America,

v.

Michael STINSON.

No. 3:94CR00050 (AHN).

United States District Court,
D. Connecticut.

July 20, 1994.

Alfred U. Pavlis, Levett, Rockwood & Sanders, Westport, CT, for plaintiff.

Kari A. Pedersen, Office of the U.S. Atty., Bridgeport, CT, for defendant.

## RULING ON MOTION TO SUPPRESS TESTIMONY RELATING TO ARREST

NEVAS, District Judge.

The defendants, George Robinson ("Robinson") and Michael Stinson ("Stinson"), are charged in a one-count indictment with robbery of a United States postal station clerk in violation of 18 U.S.C. § 2114. Presently pending is Stinson's motion to suppress all testimony relating to his arrest at 1281 State Street, Bridgeport, Connecticut, pursuant to Rules 12(b)(3), 41(f), Fed.R.Crim.P. For the reasons that follow, this motion [doc. # 21] is DENIED.[1]

---

1. Stinson also moved to suppress evidence seized from the apartment as well as certain identification testimony. Based on the government's rep-
resentation at oral argument that it would not be using the evidence Stinson sought to suppress,

*FACTS* [2]

On March 17, a grand jury sitting in Bridgeport, Connecticut, returned an indictment against the defendant Michael Stinson and his co-defendant George Robinson, charging them with the felony of robbery of a United States postal station located in Bridgeport, Connecticut. Based on this indictment, on March 18, 1994, the court issued a bench warrant for Stinson's arrest. The clerk's office prepared the warrant using Stinson's last known address as it appeared on the criminal cover sheet: 179 Yarmich Drive, Bridgeport, Connecticut.

After the indictment and issuance of the arrest warrant, postal inspectors confirmed that Stinson was no longer residing at the address stated in the warrant, but was living with his girlfriend, "Yolanda" or "Wanda," somewhere in the vicinity of Colorado Avenue and State Street in Bridgeport, Connecticut. The postal inspectors asked local letter carriers to advise them if anyone by the name of "Yolanda," "Wanda" or "Michael Stinson" was receiving mail in that area. On May 4, 1994, a letter carrier advised the inspectors that mail was being received under the names of "Yolanda Gordon" and "Michael Stinson" at 1281 State Street, Bridgeport, Connecticut. The inspectors did not seek, or obtain, judicial permission to amend the warrant to reflect this information.

On the morning of May 5, 1994, at approximately 7:10 a.m., five postal inspectors and two Bridgeport Police Officers went to the apartment at 1281 State Street. Postal Inspector Feeney ("Feeney") knocked on the front door of the apartment but received no immediate response. He knocked again and announced that he was "the police," and Gordon opened the door. Feeney asked her whether she was "Yolanda Ricks," and she replied that she was "Yolanda Gordon." ("Gordon"). Having established that she was the "Yolanda" that they were looking for, Feeney asked Gordon, "Where is Michael

Stinson?" Gordon did not reply. When Feeney asked her a second time, Gordon looked over her shoulder, turned toward the back of the apartment, and then turned back to face Feeney, indicating to Feeney that Stinson was in the back of the apartment. Another inspector proceeded to the bathroom where he found Stinson and placed him under arrest. Stinson was then removed from the apartment.

*DISCUSSION*

Although the arresting agents had a warrant for his arrest, Stinson contends that the agents had no authority to enter 1281 State Street to search for or arrest him, because the arrest warrant listed the last known address provided by the clerk's office, and not the State Street address where the warrant was executed. Stinson maintains that the officers' failure to amend the warrant issued in March to reflect the information concerning Stinson's change in address, or to have a neutral judicial officer pass on the information concerning his change of address, violated his Fourth Amendment rights and rendered the entry into his apartment and his arrest constitutionally infirm.

The government argues that the Fourth Amendment does not require police officers to limit the execution of a warrant to the address written on the face of the arrest warrant. Rather, the government contends that where, as here, the arresting officers have reason to believe that a suspect resides at a certain residence, the officers have the authority to execute an arrest warrant at such address, regardless of the address listed on the warrant. The court agrees.

A. *Failure to Obtain Judicially Modified Warrant*

■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and sei-

these motions were denied without prejudice to renewal.

2. The parties are in dispute as to the circumstances surrounding Stinson's arrest and the search of Gordon's apartment. The court's factual findings for the purposes of this ruling are

limited to the events leading up to the execution of the warrant and are based on the testimony heard at the evidentiary hearing held on July 14, 1994, as well as the uncontested representations in the parties' submissions and at oral argument.

zure...." Thus, absent exigent circumstances or consent, an entry into a home to make an arrest is unreasonable unless it is done pursuant to a warrant. *Steagald v. United States,* 451 U.S. 204, 211–212, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981) (citing *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).

The existence of an arrest warrant does not, of course, give officers license to enter and roam as they please. In *Steagald,* for example, the Court held that an arrest warrant does not give the police the authority to enter the home of a third party to conduct a search because the warrant embodies no judicial determination of the Fourth Amendment rights of the person whose home is being searched. *Id.* 451 U.S. at 213, 101 S.Ct. at 1648. In light of *Steagald,* Stinson argues that the arrest warrant does not give law enforcement officers unbridled authority to search for a suspect at an address different than the one stated on the warrant. The government contends that *Steagald* addresses only the narrow issue of the entry into and search of a third person's home during the execution of an arrest warrant.

The district court in *United States v. Nezaj,* 666 F.Supp. 494 (S.D.N.Y.1987), however, refused to interpret *Steagald* so narrowly. In *Nezaj,* the agents had a warrant to arrest "John Doe a/k/a 'Enrique' 1298 Remsen Ave Brooklyn, N.Y." When the agents went to the address on the warrant, Alfredo Quintas answered the door. The agents told Quintas that they had a warrant to arrest "Enrique," and that he fit the description. After establishing that he was not Enrique, Quintas told the agents that he knew Enrique was a fugitive and, while he could not tell them the exact address where Enrique lived, he could take the agents to the place where Enrique lived with a man named "Adam Nezaj." Quintas led the agents to a building in the Bronx. Upon questioning, the assistant superintendent of the building told one of the agents that Nezaj lived with a Hispanic male, whose name he did not know. The agents proceeded to Nezaj's apartment; knocked and announced their presence. When nobody answered the door, the agents forced entry into the apartment. Upon entering the apartment, an agent was shot and wounded. Nezaj fled from the apartment but later surrendered to the police.

Nezaj then moved to the suppress evidence seized from his apartment on the basis that the officers' entry into his apartment was unlawful. Granting Nezaj's motion, the court held that "when [the police] come to believe that there is probable cause that the target lives at a different address from the one listed on the warrant, they do not have a roving commission to execute the arrest warrant there ... [Rather,] they must appeal to a judicial officer again." *Nezaj,* 666 F.Supp. at 498. As here, the government in *Nezaj* attempted to distinguish *Steagald* as involving a suspect who was visiting, rather than living, at the address where he was arrested. The *Nezaj* court rejected such a distinction as merely "substituting one magic word for another." *Nezaj,* 666 F.Supp. at 499. As the court stated, "[t]he question of when a dwelling is someone's 'home' can be a difficult factual and legal issue.... Vesting the decision in the hands of police officers on the scene would subvert the interests that the *Steagald* rule protects." *Id.* at 500.

Relying on *Nezaj,* Stinson argues that his Fourth Amendment rights were violated when the officers failed to obtain a neutral judicial officer's review or an amended warrant to reflect Stinson's correct address, once the officers learned that the address on the warrant was no longer his proper address and that he actually resided at the State Street address. While the court questions whether the *Nezaj* court intended such a broad holding, the case is distinguishable on a number of significant grounds.

First, in *Nezaj,* the officers sought to execute a warrant for a "John Doe a/k/a Enrique" who was a fugitive from justice. Thus, the officers not only lacked clear evidence of who the suspect was, they also lacked substantial evidence that he actually resided in Nezaj's apartment, or any other place. Furthermore, the underlying arrest warrant for "Enrique" was based on a complaint, rather than an indictment, as was the case here. More significantly, the defendant in *Nezaj* was not the individual named in the arrest warrant or complaint; rather, Nazaj

came under police suspicion only as a result of the search of his apartment in an effort to locate the main suspect. In addition, in justifying the search of Nezaj's apartment, although the government did not have substantial basis to believe that Enrique actually lived with Nezaj, the government made the rather sweeping argument that a fugitive "lives," for the purposes of executing the warrant, wherever he sleeps. *Nezaj,* 666 F.Supp. at 499.

In the context of these facts, the court agrees with the *Nezaj* court that Nezaj's interests were not adequately protected by the procedures employed by the arresting agents. Yet the court believes that *Nezaj* must be read solely in the context of these very different facts, and should not be extended to apply in this instance. Indeed, the facts of *Nezaj* differ so significantly from the circumstances here that the case need not be distinguished, as the government suggests, on the grounds that the case addressed third-party interests only.[3] Rather, in light of the "John Doe" warrant and the officers' uncertainty as to whether the suspect actually resided in the apartment, had the officers actually found and arrested Enrique in Nezaj's apartment, it is questionable whether such arrest would have withstood the requirements of *Payton* or *Steagald.* Here, in contrast, Stinson was a named defendant in an indictment, he was not a fugitive as were both suspects in *Steagald* and *Nezaj,* and the arresting officers clearly had more than "slimly substantiated suspicion," *United States v. Pichardo,* 1992 WL 249964, at *4 (S.D.N.Y. Sept. 22, 1992), to believe that Stinson lived and was present at the State Street address. *Cf. id.* (distinguishing *Nezaj* ).

Taken at its broadest, however, the court recognizes that *Nezaj* may be interpreted to stand for the rule proposed by Stinson that officers must obtain amended warrants to reflect information concerning a suspect's change of address. To the extent that Judge Sweet intended *Nezaj* to state such a broad rule, the court declines to follow the case for a number of reasons.

First, emboldening *Nezaj* to require that officers obtain a judicially modified arrest warrant any time they have reason to believe that a suspect resides somewhere other than the address listed on the warrant is inconsistent with the Supreme Court's observations in *Payton,* as well as the law of this circuit. *See Nezaj,* 666 F.Supp. at 497 n. 1 (noting that the Second Circuit has adopted the *Payton* dicta as the law of this circuit). In *Payton,* the Supreme Court explained that an arrest warrant would be ineffectual if it did not carry with it "the limited authority to enter a dwelling in which the suspect lives when there is reason to believe that the suspect is within." *Payton,* 445 U.S. at 602–603, 100 S.Ct. at 1388. Thus, the Court stated that officers may execute a warrant at a specific location when they have reason to believe that the suspect resides at such location and that the suspect is present at the time of execution. *Accord United States v. Terry,* 702 F.2d 299, 319 (2d Cir.1983) ("armed with a valid arrest warrant, the agents had the right to enter the [suspect's] apartment, if they had a reasonable basis for believing [he] was there."), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Spencer,* 684 F.2d 220, 223 (2d Cir.1982) ("armed with a warrant, [the police] had authority to find and seize [the suspect] anywhere they could find him. . . ."), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). Under *Payton* and the Second Circuit precedent, therefore, an officer's authority to execute a

---

**3.** Nor is the third-party distinction the most persuasive. *Steagald* held that an arrest warrant does not provide arresting officers with authority to search a third-party's residence; the court recognized, however, that an arrest warrant "authorizes a limited invasion of [the suspect's] privacy interest when it is necessary to arrest him in his home." *Steagald,* 451 U.S. at 215 n. 7, 101 S.Ct. at 1649 n. 7. Similarly, as a rule, once lawfully inside a residence, officers are entitled to make a limited security check of the premises.

*See, e.g., United States v. Terry,* 702 F.2d 299 at 319 (2nd Cir.1983). Thus, where the premises are shared, the suspect's and the third party's rights are not divorced, but necessarily converge. For example, to the extent that a court finds that an entry into a premises to arrest a suspect is reasonable, any incriminating evidence found in plain view concerning another resident on the premises that is derived from such lawful entry would likely be upheld as well.

warrant at a particular address is limited by reason to believe that the suspect may be found at the particular address, and not necessarily by the address, or lack of address, on the face of the warrant.

The court recognizes that *Payton* does not speak directly to the question framed by Stinson's motion of whether officers can knowingly and independently depart from the address listed on an arrest warrant.[4] In other words, at the heart of Stinson's challenge is the concern, shared by this court, that officers should not have unchecked authority to modify or alter an arrest warrant; clearly, depending on the type of alteration at issue, such authority would vitiate the warrant requirement. This concern is not, however, implicated in this case because the "altered" information is not the type that is, even in the first instance, subject to the procedural safeguards attendant to the warrant requirement.[5]

■ Stinson's argument that the officers should have appealed to a neutral judicial officer to pass on the new information concerning his address presupposes that the warrant requirement applies to all of the information included on the warrant. Yet the Fourth Amendment demands that an arrest warrant be based upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense, *Steagald,* 451 U.S. at 213, 101 S.Ct. at 1648, it does not require officers to establish prob-

able cause for identifying information, such as the suspect's address, that is included on the arrest warrant but not material to the ultimate probable cause determination.[6] *Cf. Steagald,* 451 U.S. at 213, 101 S.Ct. at 1648 (arrest warrant protects an individual from unreasonable seizure, whereas search warrant is based on probable cause to believe that legitimate object of search is located in a particular place seizure, and serves to safeguard the individual's interest in the privacy of his home); *Cerva v. Fulmer,* 596 F.Supp. 86, 90 (E.D.Pa.1984) ("In an arrest warrant, unlike a search warrant, the listed address is irrelevant to its validity and to that of the arrest itself.") Indeed, the address that appeared on the arrest warrant for Stinson was not the result of any scrutiny but was merely provided by the clerk's office pursuant to established ministerial procedures.[7]

Nor can it be said that the address on Stinson's arrest warrant was so material to the initial probable cause finding on which the warrant was based that a change in such information would necessarily compromise the integrity of the probable cause finding.[8] Certainly, were an address generally considered integral to the finding of probable cause to arrest an individual, arrest warrants would be required to include addresses; yet Stinson concedes that there is no such requirement.[9] *Accord Pichardo,* 1992 WL 249964, at *4 (declining to extend *Nezaj* to impose a requirement on officers to obtain a search war-

---

**4.** *Compare Payton,* 445 U.S. at 586 n. 24, 100 S.Ct. at 1380 n. 24 (" '[The Fourth Amendment's] protection consists in requiring that [ ] inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' " (citation omitted)).

**5.** *See, e.g.,* Rule 41(c) ("A warrant other than a warrant on oral testimony ... shall issue only on an affidavit or affidavits sworn to or before the federal magistrate ... and establishing the grounds for issuing the warrant.... [T]hat magistrate judge ... shall issue a warrant identifying the property or person to be seized and naming or describing the person or place to be searched.").

**6.** The court does not address or attempt to suggest what, if any, information other than the address might fit within this category.

**7.** Furthermore, the arrest warrant issued for Stinson did not even provide lines for the ad-

dress to be included; it contained a line for the suspect's name, and the address was typed in the space below. Interestingly, the warrant at issue in *Nezaj* requested both the name and address of the individual to be arrested. *See Nezaj,* 666 F.Supp. at 495.

**8.** This is not to say that the address is never an important aspect of the probable cause to issue the warrant. Indeed, the address may play a vital role where, as in *Nezaj,* the officers have a John Doe warrant.

**9.** Rule 4(c)(1), Fed.R.Crim.P., for example, does not mention any requirement that the suspect's address be set out in an arrest warrant: "The warrant shall ... contain the name of the defendant or, if his name is unknown, any name or description by which he can be identified with reasonable certainty."

rant whenever an arrest warrant has no address); *Harasim v. Kuchar,* 702 F.Supp. 178, 181 (N.D.Ill.1988) (address not appearing on warrant may be searched where officers have reason to believe suspect resides at the address); *Cerva,* 596 F.Supp. at 90 (arrest may be made at location other than address listed on the warrant where the officers have reason to believe that suspect is there). *See also Payton,* 445 U.S. at 602–03, 100 S.Ct. at 1388 ("If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.").

The court notes that if the procedural requirements suggested by Stinson did apply, the court agrees that the circumstances surrounding the arrest were not so exigent as to justify noncompliance with such procedures. Based on Feeney's testimony, it is clear that the warrant was outstanding for over six weeks and that Feeney was aware of the discrepancy between the address on the warrant and the intended address of execution at least the day before the warrant was executed. However, the officers' conduct need not be justified through exception because the court finds that an officer is not required to obtain a judicially modified warrant to execute a warrant at an address that is different from the address that appears on the warrant where, as here, the officers have reason to believe that the suspect lives and is present at the address of execution. Application of the contrary rule urged by Stinson would lead to the anomalous result that a warrant that contained an address would be subject to greater circumscription than a warrant that had no address at all. As a practical matter, therefore, the rule suggested by Stinson, and arguably *Nezaj,* would not necessarily insulate the Fourth Amendment, but would create a strong disincentive to include addresses on arrest warrants.

### B. *Authority to Enter the Apartment Pursuant to Arrest Warrant*

Having found that the police officers' failure to amend the warrant or to seek judicial oversight was not a per se constitutional violation, the court must still determine whether the officers were justified in executing the warrant at the State Street address. As discussed above, this analysis is informed by the Supreme Court's discussion in *Payton,* in which the Court explained that an arrest warrant gives officers limited authority "to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton,* 445 U.S. at 603, 100 S.Ct. at 1388; *accord Steagald,* 451 U.S. at 221, 101 S.Ct. at 1652 ("an arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest.") Thus, the first prong of this inquiry is whether the officers had reason to believe that Stinson resided at 1281 State Street, and the second prong is whether the officers had reason to believe that Stinson was "within" his residence at the time they executed the warrant.

■ Based on Feeney's testimony, the court concludes that Stinson's arrest survives both prongs. On February 2, 1994, at Feeney's direction, Postal Inspectors Hinman and Meyers interviewed Cynthia Allen who resides at the Yarmich Drive address listed on the arrest warrant. During this interview, she told the inspectors that Stinson no longer resided at the Yarmich Drive address, and that he may have a girlfriend named "Wanda" or "Yolanda." During interviews conducted on February 22, and April 20, 1994, Feeney received information from Robinson, Stinson's co-defendant, that Stinson was living with his girlfriend in the vicinity of Colorado Avenue and State Street in Bridgeport, Connecticut. This information was corroborated on May 4, 1994, when Feeney learned from a letter carrier that individuals by the names of "Yolanda Gordon" and "Michael Stinson" were receiving mail at the State Street address. Thus, the inspectors had substantial reason to believe that Stinson lived with Yolanda Gordon at 1281 State Street.

■ Furthermore, once they had reason to believe that Stinson was living at the State Street address, it was reasonable for the officers to believe that Stinson would actually be at the address at approximately 7:00 a.m. on May 5, 1994 when the warrant was executed. *Cf. Terry,* 702 F.2d at 319 (finding

officers had reason to believe suspect would be at home on Sunday at 8:45 a.m.) In addition, Gordon's response, albeit non-verbal, to Feeney's question whether Stinson was in the apartment provided the officers with further grounds to believe that Stinson was in the apartment at the time they intended to execute the warrant. *Cf. Spencer*, 684 F.2d at 223 (where officers told 35 minutes prior to execution that suspect was home, and confirmed that suspect lived at address but could not confirm whether suspect was actually home, officers had a reasonable basis to believe that suspect was within). Therefore, the officers acted reasonably and within the confines of the Fourth Amendment when they executed the warrant, and the testimony concerning the circumstances of the arrest need not be suppressed.[10]

### CONCLUSION

Based on the foregoing, Stinson's motion to suppress testimony [doc. # 21] is DENIED.

SO ORDERED this 20th day of July, 1994 at Bridgeport, Connecticut.

---

10. The government argues that even if the arrest was illegal, suppression is unwarranted because the exclusionary rule does not apply to testimony relating to the circumstances of the arrest. In essence, the government questions whether the officers' observations can be considered the "fruit" of an illegal arrest. *See Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1983) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), *overruled on other grounds by United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980)). While observa-tion evidence may not be as tangible as the viewing of illegal contraband, *Segura*, 468 U.S. 796, 104 S.Ct. 3380, or declarations made by the accused upon arrest, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), it seems that such observations could be reasonably characterized as "knowledge gained by the government's own wrongs," to which the exclusionary rule would apply. *Wong Sun*, 371 U.S. at 485, 83 S.Ct. at 416. However, in light of the court's ruling that the arrest was lawful, the court need not decide this issue.