OPINION
{¶ 1} The appellant, the State of Ohio, appeals the decision of the Logan County Court of Common Pleas granting the appellees-defendants' motion to suppress evidence seized during a search of a residence.
 {¶ 2} In early February 2004, Logan County Sheriff Detective Jon Stout was investigating information that drugs were being used and sold at the residence of Keith Kerr and Marina Crawford in Logan County, Ohio. Detective Stout was familiar with Kerr, Kerr's girlfriend, Crawford, and Crawford's daughter, Shanna Kreglow, because of previous drug investigations. According to Detective Stout, he knew that Crawford was living with Kerr, and, that for periods of time, Kreglow was also staying at Kerr's address.
 {¶ 3} On the night of February 9, 2004, Detective Stout set up surveillance outside of Kerr's residence to monitor possible drug activity. Around 10 p.m., Detective Stout saw a dump truck drive up Kerr's driveway and a male exit the vehicle. The male went into the residence for approximately three to four minutes and then left the scene. Because Detective Stout was suspicious of this activity, he followed the dump truck in an unmarked police car before pulling it over for a dimmed taillight and failure to display a rear license plate.
 {¶ 4} During the stop, Detective Stout identified the dump truck driver as Mario Castaloni. Castaloni informed Detective Stout that he received a call from Crawford, who told him that there was crack cocaine at Kerr's residence. As a result, Castaloni went to Kerr's house, without any money, in an attempt to get fronted the drugs so he could pay later, but he was denied. Castaloni told Detective Stout that Kerr, Crawford, Kreglow, and another male from Dayton that Castaloni knew as "B" were inside Kerr's house. Next, Detective Stout searched Castaloni's person and vehicle and found a crack pipe but no drugs. Before the stop ended, Castaloni warned Detective Stout of Castonli's previous visit to B's house in Dayton where he "was greeted by an AK-47 at the door" when Castaloni attempted to purchase cocaine. Castaloni suggested that Detective Stout should bring the S.W.A.T. team if he was going to Kerr's residence.
 {¶ 5} Based on his conversation with Castaloni, Detective Stout contacted the police dispatch to confirm his knowledge that Kreglow had an outstanding felony arrest warrant in her name. After receiving information that there was an outstanding warrant,[1] Detective Stout requested officer back-up to meet a short distance from Kerr's residence in order to approach the residence without being seen.
 {¶ 6} Approximately five Logan County deputies arrived to assist Detective Stout. Detective Stout informed the officers of the situation, and, subsequently, the officers proceeded up the driveway by foot. Upon arrival, Detective Stout approached the door and observed, through a small window on the door, Kerr sitting on a chair in the living room. At about the same time, Detective Stout also saw a man, later identified as Cairo Buggs (a.k.a. "B"), walk by the door.
 {¶ 7} Detective Stout immediately knocked on the door and announced his presence. Detective Stout heard Buggs make a reference to the Sheriff's Office or about detectives being at the door; therefore, the detective knocked and announced again. Consequently, Buggs opened the door.
 {¶ 8} At this point, the testimony of Buggs and Detective Stout conflicts. At the suppression hearing, Detective Stout testified that he believed that Buggs gave him permission to enter Kerr's residence. Buggs, however, denied giving the detective any access to the house. Similarly, even though both Detective Stout and Buggs testified that the detective approached the door with his gun drawn, Detective Stout testified that he was carrying the gun in a "low position," whereas Buggs testified that the detective's gun was pointed directly at his face. On cross-examination, Detective Stout further testified that the other officers likely had their guns drawn as well.
 {¶ 9} Upon entering the residence, Detective Stout saw Crawford and Kreglow sitting on a couch in the living room. Detective Stout immediately asked if there were any other people in the house, and Crawford advised him that Kerr was in the back of the residence. Thus, according to Detective Stout's testimony, he went to the back of the house to search for Kerr with Crawford's permission.
 {¶ 10} The detective found Kerr in the back bathroom combing his hair. Again, there is conflicting testimony between Detective Stout and Kerr as to the following events. Detective Stout testified that he told Kerr that he (Stout) knew that drugs were being used in the house, at which time Kerr broke down in tears and stated that he needed help. Next, Detective Stout asked Kerr for permission to search his house for drugs, and, according to the detective, Kerr consented. Contrarily, Kerr testified that he did not tell the detective that he had a drug problem or that the police could search his home. Nevertheless, before Kerr and Detective Stout went back to the living room to join the others, Detective Stout found a crack pipe near the toilet and, what Detective Stout identified as a $20 crack rock, in the toilet. Detective Stout testified that he attempted to retrieve the rock, but it dissolved upon contact.
 {¶ 11} Once the residence was secure, officers searched the house and found a crack cocaine rock on the floor in the living room where everyone was convened. Next, Detective Stout asked for Kerr's permission to search his house with a K-9 unit. After being informed of his rights, Kerr orally consented, and signed the form; however, the record suggests that the consent form may be improperly executed.[2] In all, some crack cocaine, two crack pipes, a wire pusher, and a copper scrubber were found Kerr's residence.
 {¶ 12} Crawford, Kerr, Kreglow, and Buggs were all subsequently arrested. The next morning, after being read their Miranda rights and signing the appropriate Miranda waivers, Detective Stout interviewed all four defendants, and they all admitted to using crack cocaine at the residence the night before.
 {¶ 13} Kerr, Crawford, and Buggs were each ultimately charged with one count of possession of drugs in violation of R.C. 2925.11(A). Buggs, Kerr, and Crawford each plead not guilty,[3] and on June 9, 2004, a hearing was held in the Logan County Common Pleas Court on Buggs' motion to suppress the evidence seized from Kerr and Crawford's residence. Kerr and Crawford joined in the motion to suppress. At the hearing, Detective Stout was the only witness called by the State. Both Kerr and Buggs testified to the suppression issues but not as witnesses in the case in order to preserve their constitutional right against self-incrimination.
 {¶ 14} On June 21, 2004, the trial court granted the defendants' motion to suppress the evidence, and the State of Ohio appeals pursuant to Appellate Rule 12(K) alleging one assignment of error. The cases of all three defendants are consolidated for this appeal.
The trial court erred in suppressing statements and physical evidenceacquired by Logan County Sheriff Officers in the Home of Keith Kerr.
 {¶ 15} When appealing a trial court's judgment on a motion to suppress, an appellant may challenge the court's findings of fact, interpretation of the law, or identification of issues to be addressed in the suppression motion. In reviewing a challenge based on findings of fact, an appellate court must determine whether the factual findings are against the weight of the evidence. State v. Fanning (1982),1 Ohio St.3d 19, 20, 437 N.E.2d 583, citing State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212 ("Moreover, it is fundamental that the weight of the evidence and credibility of witness [sic] are primarily for the trier of the facts."). On the other hand, when challenging a trial court's decision based on failing to use the correct legal standard or appropriate law, an appellate court can reverse the lower court's decision for the legal error. State v. Williams (1993), 86 Ohio App.3d 37, 41
reversed on other grounds. Finally, when a trial court's factual findings are not against the weight of the evidence and it did apply the correct law, an appellant may challenge a lower court's ruling if the court failed to identify the correct issues in the suppression hearing. Statev. Yerkey (Nov. 13, 2001), 5th Dist. No. 2001CA00007, unreported.
 {¶ 16} In essence, the trial court in this case determined: (1) that Buggs' alleged consent to enter the home was inherently coerced and involuntary due to the number of police officers brandishing guns[4]
and (2) that all of the evidence seized afterwards and any subsequent consents by the owners were barred by the fruits of the poisonous tree doctrine. In addition to challenging those determinations, the State contends that there were exigent circumstances to enter Kerr's residence because Detective Stout had reason to believe that drugs were immediately being used there. Finally, the State argues that because Kreglow had an outstanding warrant for her arrest, the police had a right to enter the home to arrest her.
 Entering the Residence Consent to Enter {¶ 17} In State v. Thompkins, the Ohio Supreme Court stated:
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a thirteenth juror and disagrees with the factfinder's resolution of the conflicting testimony. The Court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
 State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541
(internal citations and quotations omitted). Even though Thompkins
primarily concerns reversing a jury verdict based on the weight of the evidence, the same legal standard can be applied when determining a factual determination in a suppression hearing. See Fanning,1 Ohio St.3d at 20 ("This principle is applicable to suppression hearings as well as trials.").
 {¶ 18} In the case before us, the trial court concluded:
 In this case, Officer Stout testified that, although he was not in uniform, he had his gun drawn as he entered the residence. He also testified that up to five uniformed officers entered the house with him, and that it was likely that they had their weapons drawn as well. A reasonable person, under these circumstances, would not have felt that they had the choice of refusing entry. In fact, even Officer Stout agreed that an ordinary person in Defendants' position would have felt that the officers' actions constituted a significant show of force. Although the Court finds that Mr. Buggs was entitled to give the officers consent as an overnight guest, it does not find that his consent was voluntary.
Judgment Granting Suppression at p. 6. After weighing the evidence, the trial court determined that Buggs could not have formulated voluntary consent to allow Detective Stout and the other officers to enter Kerr's residence. To come to this conclusion, the trial court balanced the detective's testimony that he was carrying his weapon was in a "low carry" position versus Buggs' testimony that Detective Stout's weapon was pointed directly at Buggs' face, and determined that a reasonable person in Buggs' circumstances would not have felt that they had the choice of refusing entry. Moreover, as the court noted, even Detective Stout testified that approximately five officers at the door with their guns drawn constituted a significant show of force.
 {¶ 19} We do not construe the trial court's ruling as holding that drawn weapons by several police officers alone would render any alleged consent to enter involuntary and coerced as a matter of law, nor would we endorse such a holding. Rather, it is apparent that the trial court had the opportunity to hear and evaluate the testimony of Detective Stout and Buggs, including a number of inconsistent statements Buggs made the next morning regarding the incident, and that the basis of the trial court's decision was that the trial court chose to weigh the credibility of the witnesses in favor of Buggs. Under these circumstances, we cannot find the trial court's factual determinations as to the consent are against the weight of the evidence. See Fanning, 1 Ohio St.3d at 20.
 Exigent Circumstances {¶ 20} One recognized exception to the Fourth Amendment warrant requirement is exigent circumstances. Payton v. New York (1980),445 U.S. 573, 582-83, 100 S.Ct. 1371. The exigent circumstances exception is based on the premise that certain situations demand urgent police action, which may excuse an officer from failure to secure a search warrant. Welsh v. Wisconsin (1984), 466 U.S. 740, 749, 104 S.Ct. 2091. When the government claims a warrantless search is valid under the exigent circumstances exception, the search was usually a result of an emergency or dangerous situation. Payton, 445 U.S. at 583. Nevertheless, even though there is no set list of exigent circumstances that justifies a warrantless search, "exigent circumstances generally must include the necessity for immediate action that will `protect or preserve life or avoid serious injury,' or `will protect a governmental interest that outweighs the individual's constitutionally protected privacy interest.'"State v. Nazarian, 9th Dist. No. 04CA0017-M, 2004-Ohio-5448 at ¶ 10
citing Mincey v. Arizona (1978), 437 U.S. 385, 392-93, 98 S.Ct. 2408. In the evidentiary context, the exigent circumstances exception permits a warrantless search "when there is imminent danger that evidence will be lost or destroyed if a search is not immediately conducted. State v.Moore (2000), 90 Ohio St.3d 47, 52, 734 N.E.2d 804 citing Cupp v. Murphy
(1973), 412 U.S. 291, 294-96, 93 S.Ct. 2000. Finally, when trying to prove a Fourth Amendment exception exists, the State bears the burden of proof in order to survive a motion to suppress. State v. Kessler (1978),53 Ohio St.2d 204, 207, 373 N.E.2d 1252.
 {¶ 21} In the case sub judice, the trial court determined that the evidence presented at the suppression hearing did not meet the underlying requirements to constitute exigent circumstances. The court stated:
 For one, Officer Stout admitted that not only did the officers have the residence secured but that he was confident that no one could have slipped out the back door either. Moreover, Detective Stout testified that Mr. Castaloni told him that he never saw any drugs or guns in Mr. Kerr's residence, that he himself never saw any drugs or weapons prior to entering Mr. Kerr's residence, nor were there any guns in fact found in Mr. Kerr's home. Considering the totality of the evidence, this Court finds that the State has not proven by a preponderance of the evidence that the officers' warrantless entry into Mr. Kerr's residence was justified by exigent circumstances.
Judgment Granting Suppression at p. 8.
 {¶ 22} Again, given the factual basis of the trial court's decision, this Court will not disturb a lower court's judgment unless it is against the weight of the evidence. See Fanning, 1 Ohio St.3d at 20. The trial court clearly weighed the testimony of the witnesses and determined that there were insufficient exigent circumstances for Detective Stout to enter Kerr's residence without a warrant. Upon review of the same testimony, we cannot say that the trial court's determination is against the weight of the evidence.
 The Arrest Warrant {¶ 23} While the previous arguments were based on reversing the trial court because its factual determinations were against the weight of the evidence, the argument of whether Kreglow's outstanding arrest warrant gave Detective Stout authority to enter Kerr's residence is a mixed question of law and fact. Relying on a trial court's factual findings, an appellate court determines de novo whether a trial court applied the correct legal standard. Williams, 86 Ohio App.3d at 41.
 {¶ 24} In Payton, the United States Supreme Court concluded that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, 445 U.S. at 603; cf. Steagald v. United States (1981),451 U.S. 204, 101 S.Ct. 1642 (holding that absent exigent circumstances or consent, police officers cannot lawfully search for the subject of an arrest warrant in a third person's home without first obtaining a search warrant). Under Payton, therefore, officers may effectuate an arrest warrant at a location when they believe that the subject of the warrant lives at a residence and that belief is supported by probable cause.Jackson v. Holyman (6th Cir. 1993), 12 F.3d 212, 1993 WL 501591 (per curiam); United States v. Stinson (D. Conn. 1994), 857 F.Supp. 1026,1029 ("Thus, the Court stated that officers may execute a warrant at a specific location when they have reason to believe that the suspect resides at such location and that the suspect is present at the time of execution.") accord United States v. Terry (2d Cir. 1983), 702 F.2d 299,319, cert denied, 461 U.S. 931, 103 S.Ct. 2095 and United States v.Spencer (2d Cir. 1982) 684 F.2d 220, 223, cert denied 459 U.S. 1109,103 S.Ct. 738. When determining whether someone resides at a residence, "an officer's authority to execute a warrant at a particular address is limited by reason to believe that the suspect may be found at the particular address, and not necessarily by the address, or lack of address, on the face of the warrant." Stinson, 857 F.Supp. at 1030-31.
 {¶ 25} In the case sub judice, the first prong is to determine whether Detective Stout had probable cause to believe that Kreglow was residing with Kerr and Crawford, and the second prong is whether Detective Stout had probable cause to believe that Kreglow was "within" Kerr's residence at the time the warrant was executed.
 {¶ 26} At the suppression hearing, Detective Stout first testified:
 Q: And where did you hear that Shanna Kreglow — you didn't even know she was in the house, did you?
 Detective Stout: I had information that Shanna had been staying in and out of that residence
 Q: From where?
 Detective Stout: Initially I had it from Keith Kerr and Marina Crawford that she had been in and out staying at their place back in October.
Suppression Hearing Tr. at p. 65. Furthermore, Keith Kerr stated:
 Q: And her — her daughter, Shanna Kreglow, did she on occasion stay over at that residence with you?
 Keith Kerr: Once in a while she stayed overnight, that is correct.
 Q: Okay. And on the night that the officers came to your house, it is near midnight, I believe, when they knocked on your door. Keith Kerr: 11:30 or so.
 Q: It would be safe to say that Shanna is staying the night that night too?
 Keith Kerr: No.
 Q: It's not safe to say?
 A: No. She was not living there at that point in time. She had not lived there for two or three weeks. She was living with some other friends.
Suppression Hearing Tr. at 96-97. Based on this testimony, the trial court summarized:
 [T]he officers in this case went to a home without a search warrant for the purpose of executing an arrest warrant of a nonresident who they believed was present, a search that resulted in the officers discovering evidence and charging the Defendant. Mr. Kerr testified that, although Ms. Kreglow had on occasion spent the night at his house, she had no intention of spending the night there on February 9, 2004, nor was she living with him for about two or three weeks. Furthermore [Kreglow's arrest warrant] indicates that Ms. Kreglow's address is 303 Carlise Street. . . . The State has the burden of proving that Ms. Kreglow resided at 2356 County Road 255 at the time of the entry, and after reviewing the transcript and the exhibits introduced at the suppression hearing, this Court finds that the State has not met their burden. As a result, even though an arrest warrant had been issued for one of the occupants of Mr. Kerr's house, because that occupant was not a resident, the officers were required to obtain a search warrant prior to entering.
Judgment Granting Suppression at p. 10 (emphasis added).
 {¶ 27} Preliminarily, it must be noted that contrary to the ruling of the trial court, the State does not have the burden of proving that the person named in the arrest warrant is an actual resident of the home where he or she is arrested. As noted in Payton, Jackson, and Stinson, supra, the State has the burden of proving that police officers have probablecause to believe that the subject of an arrest warrant resides at the home where he or she is arrested. Thus, in the instant case, the inquiry focuses on whether Detective Stout had probable cause to believe that Kreglow was residing at Kerr's residence on the night of the entry. Furthermore, the trial court's reliance on the specific addresses stated in the arrest warrant is not determinative. As the court stated inStinson, the focus is not on addresses, or lack of addresses, written on the warrant, but on the police officers' reasonable belief of the subject's residence when executing an arrest warrant.
 {¶ 28} It is clear from Detective Stout's testimony that he believed from the information he gathered from Kerr in the past that Kreglow was residing at the Kerr residence at the time the warrant was executed. Moreover, as the trial court stated in the judgment granting suppression, even Kerr testified that Kreglow was, in fact, living with Kerr and Crawford until about two or three weeks prior to the incident at bar. While Kerr's subsequent testimony is irrelevant to the detective's knowledge of whether Kreglow was living with Kerr prior to entering the home, it does corroborate Detective Stout's allegation that in October, Kerr informed him that Kreglow was living in his house. Furthermore, the defendants presented no evidence that Detective Stout knew or should have known that Kreglow stopped living at Kerr's residence two or three weeks prior to the February arrest as Kerr stated at the suppression hearing.
 {¶ 29} Taking the officer's reasonable belief based on information from Kerr that as recently as October, Kreglow was living at the residence, coupled with Castaloni's statements that Kreglow was physically present at Kerr's residence on February 9, 2004, we conclude that Kreglow was a resident of Kerr's home for Payton purposes. SeeJackson, 12 F.3d 212, 1993 WL 504591; Stinson, 857 F.Supp. at 1029. In other words, Detective Stout had probable cause to believe that Kreglow was living at the Kerr residence, which gave the detective the requisite authority to enter the residence to execute the arrest warrant underPayton.
 {¶ 30} In sum, we affirm the trial court's decision finding that there was no valid consent to enter the home and insufficient exigent circumstances to justify the lack of a search warrant. On the other hand, we reverse the trial court's decision as to the authority the arrest warrant gave Detective Stout to lawfully enter Kerr's residence to apprehend Kreglow. To this extent only, the State's assignment of error is sustained.
 {¶ 31} However, because the trial court found that Detective Stout's initial entry into Kerr's residence was illegal and, as a result, barred all subsequent consents and evidence found as a fruit of the poisonous tree, the trial court made no independent determinations as to whether any subsequent consents to search the home were valid; or whether the evidence retrieved might be admissible under any other Fourth Amendment exception, such as the "plain view" doctrine.[5] Thus, having concluded that Detective Stout's initial entry into Kerr's residence was lawful, the decision of the trial court granting the motion to suppress must be reversed and we remand this case for further proceedings as to whether any evidence obtained subsequent to the initial entry should be suppressed.
Judgments Reversed and Causes Remanded.
 BRYANT, J., concur.
[1] There are some discrepancies as to whether there were one or two warrants outstanding for Kreglow's arrest. Nevertheless, the record does reflect that there was at least one outstanding felony warrant from Champaign County.
[2] In the trial court's suppression entry, the court noted that there was "some indication in the record that suggests that Mr. Kerr's written consent was not . . . valid because the consent form was improperly executed."
[3] The record is not clear as to what happened to Kreglow after confessing to Detective Stout that she was smoking crack cocaine at Kerr's residence. Nevertheless, Kreglow is not a defendant in this particular action.
[4] It is not contested that as an overnight guest, Buggs had standing to object to or consent to the initial entry into the home.
[5] As noted earlier, the trial court does mention a possible problem with the execution of a subsequent consent to search but does not elaborate.