**UNITED STATES of America,**

**v.**

**Abdullah NEZAJ, a/k/a Adam Nezaj, Defendant.**

**No. 87 Cr. 0152 (RWS).**

United States District Court,
S.D. New York.

July 21, 1987.

---

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for U.S.; Deirdre M. Daly, Asst. U.S. Atty., of counsel.

Joseph R. Benfante, P.C., New York City, for defendant; Joseph R. Benfante, of counsel.

SWEET, District Judge,

Defendant Adam Nezaj, also known as Abdullah Nezaj ("Nezaj"), has been charged in a three-count indictment, with attempted murder of a federal law enforcement officer, use of a firearm in relation to a crime of violence and a crime of drug trafficking, and possession of heroin with intent to distribute. He has moved for an order suppressing certain physical evidence on the grounds that it was seized in violation of the Fourth Amendment of the United States Constitution. Nezaj has also moved for an order to suppress certain statements he made to law enforcement officers, exclude certain tapes, to require the government to file responsive papers to a bill of particulars, and to compel certain discovery. A hearing was held on the motion on June 25. For the reasons set forth below, the motion to suppress the physical evidence is granted, and all other motions are denied.

**Facts**

This case arises out of the execution of an arrest warrant for another party, Enrique Rivadulla ("Enrique") at another dwelling.

On February 5, 1987, the government applied for an arrest warrant for a JOHN DOE a/k/a "Enrique" a/k/a "El Gordo." The application for a warrant was accompanied by an affidavit sworn to by Gene Blahato ("Blahato"), a Special Agent of the Drug Enforcement Agency ("DEA"). Blahato's affidavit outlined an extensive drug conspiracy, of which Enrique was alleged to be a member. After a detailed recital of the evidence that had been gathered with respect to Enrique, Blahato concluded: "Based on the foregoing and the other facts set forth in this affidavit, I believe that ENRIQUE is a narcotics trafficker who resides at the 1st Floor Apartment, 1298 Remsen Street, Brooklyn, New York."

On the strength of this affidavit, the Hon. Ruth V. Washington, United States Magistrate for the Southern District of New York, issued an arrest warrant for Enrique. In the spot on the printed arrest warrant form labelled "NAME *AND AD-DRESS* OF INDIVIDUAL TO BE ARRESTED" (emphasis added), the warrant reads:

JOHN DOE, a/k/a "Enrique,"

a/k/a "El Gordo,"

1298 Remsen Ave.

Brooklyn, N.Y.

Thus the Magistrate made a finding that probable cause existed to arrest Enrique, and probable cause existed that he lived at 1298 Remsen Avenue, in Brooklyn.

At 5:00 in the morning the next day, agents from the DEA, the United States Custom Service and the Bureau of Alcohol, Tobacco and Firearms went to the Remsen Avenue address to execute the arrest warrant. Agent Joan Marin ("Marin") was the leader of the team executing the warrant. According to Marin, a man named Alfredo Quintas ("Quintas") answered the door. The agents told Quintas that they were executing an arrest warrant for someone named "Enrique," and told him that he fit the description. Quintas said that he was not Enrique and produced a passport and a California driver's license with his name on it. He also said that Enrique did not live there, that he knew that Enrique was a fugitive, and that he could take them to where Enrique lived, but could not give them the exact address. According to Marin, Quintas said that he had spoken with Enrique a few days before, and had previously been to an address where Enrique "lived with a man named Adam Nezaj." Agent Marin telephoned an Assistant Unit-

ed States Attorney to relay this information, and the Assistant directed her to proceed to the new dwelling—the exact address of which was still unknown at that point—to execute the warrant.

At the time of the suppression hearing, the government represented that Quintas had returned to California, and that they had been unable to locate him, so the only version of events presented was Marin's.

Quintas then took the agents to Nezaj's neighborhood, where they were met by another team of approximately seven agents. Quintas pointed out the dwelling, which was 4601 Henry Hudson Parkway, Apartment A–8. He then waited in the car. Agent Marin went to the office of the apartment complex's Superintendent. The Super was not there, but the Assistant Superintendent, Sefik Gunes ("Gunes"), was there. Agent Marin asked Gunes who lived in apartment A–8. According to Marin's testimony at the suppression hearing, Gunes said that Nezaj lived there with a Hispanic male whose name he did not know. Gunes testified that he had seen a Spanish male in the laundry room one and a half or two months before, and had seen him inside Nezaj's apartment 3 or 4 months earlier. He also testified that he saw him go in and out about once a month.

Agent Marin asked to speak with the Superintendent, Mr. Feyyaz Hurer ("Hurer"), who was reached on the phone after several tries. According to Hurer, Agent Marin asked him if he had a key for Nezaj's apartment, which he did not. She also asked if he would allow his Assistant Superintendent to knock on Nezaj's door to help the agents gain entrance, and Hurer instructed Gunes to do so. Hurer testified that before the agents entered the apartment, no one had asked him whether someone known as Enrique lived there, and that he had last seen a Hispanic male in the complex who he thought was a resident's guest about 18 months ago. The agents asked neither Hurer or Gunes to see a lease.

The agents made no effort to obtain a search warrant for the dwelling, or to have the arrest warrant judicially modified so that it reflected Enrique's new suspected address rather than the Remsen Avenue address at which it had first been executed.

Gunes went with the agents to the front door and knocked on it while the agents stood to either side of the door. Nobody answered. Marin's testimony was that the agents then sent Gunes away and began knocking on the door themselves and loudly announcing "police." According to Marin at this point the agents heard movement inside the apartment. They took this as an indication that the fugitive was inside and knocked down the door with a sledge hammer, as the agents all continued to announce "police." The door came down quickly, the agents advanced into a dark hallway with the light at their backs and their weapons drawn. Immediately upon entry an agent was shot and seriously hurt. Several hours later, Nezaj—who had fled the apartment into a crawl space connecting his apartment and another—called 911 and surrendered after negotiation by telephone. According to the report prepared by Agent Marin on February 9, "Nezaj was accompanied from apartment A–7 by officers of the NYPD.... After the apartment was secured, two weapons were discovered within the apartment by the New York Emergency Services Unit. One of the weapons was recovered by the New York Emergency Services Unit. One of the weapons was recovered from the apartment crawl space between Apartments A–7 and A–8 and was later determined to be the weapon used by Nezaj in the shooting."

Enrique was not at the apartment, although the agents discovered his passport and clothing believed to be his in a room with no furniture and no bed, which they took to be the room in which he "lived."

Some time later the day of the shooting, members of the New York City Police Department's Crime Laboratory went to Apartment A–8. There is nothing in the record to suggest that the Crime Lab personnel had a warrant of any kind. According to an affidavit sworn to by Agent Blahato, "Pursuant to their efforts to reconstruct the shooting, these officers discovered plastic bags filled with tannish-white

powder, an Ohaus scale, guns, and ammunition." Largely on the basis of this discovery, the government sought and received a search warrant, and executed it to seize the items listed.

**Discussion**

### A. Suppression of Evidence

Nezaj has moved for the suppression of evidence seized from his apartment on the grounds that the agents' entry—and subsequent discovery of the items—violated his Fourth Amendment rights. According to the government, the agents' entry was authorized by *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Suppressing the evidence would seriously undermine the third count, but have little effect on the counts alleging attempted murder and use of a firearm in a crime of violence.

The narrow issue presented here is this: given that an arrest warrant may be executed at a target's home, who must make the determination that any specific dwelling is a particular target's home—a judicial officer or the policeman on the street.

In *Payton,* the Supreme Court reversed two New York Court of Appeals decisions each of which had upheld the arrest of a felon in his home without a warrant. After an extensive discussion of the purpose and history of warrants, the sanctity of the home and the Fourth Amendment, the court held that a warrantless arrest of a felon in his home is unconstitutional, and, consequently, reversed the convictions.

Although no warrant of any kind had been issued in the case (and consequently it was not at issue whether an arrest warrant is sufficient to enter the home as opposed to a search warrant), the Supreme Court in *dicta* observed that an arrest warrant would be sufficient to arrest the object of the warrant in his home.[1] "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when

there is reason to believe the suspect is within." *Id.* at 603, 100 S.Ct. at 1388. The Court did not address the issue of whether the arrest warrant had to list the target's address (there is space provided to do so in the standard printed form used in this district) in order to be executed there, and there was no question that the dwellings in question were indeed the felons' homes. Also, the Court explicitly reserved the question of the authority of the police to enter a third party's home to arrest a suspect when armed with an arrest warrant. *Id.* at 583, 100 S.Ct. at 1378.

In *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Supreme Court addressed the issue of a third party's home that had been reserved in *Payton.* In *Steagald,* a DEA agent had an arrest warrant for a fugitive named Ricky Lyons ("Lyons"). The agent received a tip from a reliable informant that Lyons would be at a certain telephone number for the next 24 hours, and obtained from the telephone company the address that corresponded to the telephone number. The court assumed *arguendo* that these facts gave the DEA probable cause to believe that Lyons was at that address.

With the arrest warrant for Lyons but without a search warrant for the residence, DEA agents entered and searched the house. The DEA did not find Lyons, or apparently any trace of him, but did find evidence that they used against the resident of the house, who was convicted. 451 U.S. at 206–07, 101 S.Ct. at 1644–45.

Although the agents had a valid arrest warrant for a fugitive, and although they had sufficient probable cause to believe that the fugitive was in the specific dwelling that they entered, the Supreme Court reversed the conviction. In doing so, the Court discussed the different interests that search and arrest warrants are intended to serve. An arrest warrant: "primarily serves to protect an individual from an unreasonable seizure." *Id.* at 213, 101

---

1. The Second Circuit has since adopted this *dicta* as the rule of this Circuit. *See United States v. Terry,* 702 F.2d 299, 318–19 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Spencer,* 684 F.2d 220, 222–23 (2d Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983).

S.Ct. at 1648. However, a search warrant "safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." *Id.* The Court wrote:

> [T]he agents sought to do more than use the warrant to arrest Lyons in a public place or in his home; instead they relied on the warrant as legal authority to enter the home of a third person based on their belief that Ricky Lyons might be a guest there. Regardless of how reasonable this belief might have been, *it was never subjected to the detached scrutiny of a judicial officer....* Instead, petitioner's only protection from an illegal entry and search *was the agent's personal determination of probable cause.*

*Id.* at 213, 101 S.Ct. at 1648 (emphasis added).

The government argues that the entry of Nezaj's apartment in this case is governed by *Payton.* Specifically, it argues that an arrest warrant for Enrique (admittedly issued by the magistrate listing a different address) can be executed without further approval by any law enforcement officer at any address which the agents subsequently come to believe is Enrique's home.

*Steagald* had one very clear interest in mind: the Constitution does not allow police officers, exercising their own discretion, to enter dwellings of third parties—"presumptively innocent people," 451 U.S. at 222, 101 S.Ct. at 1652—in search of persons known to be felons. Without interposing a judicial determination of probable cause between the officer and the entrance into a dwelling of the presumed innocent third party, the risk of unlawful intrusion is too great for the Fourth Amendment to countenance. If this is the goal that is driving the *Steagald* rule, then it necessarily must also be a rule that it is the magistrate, *not* the police officer, who must decide whether probably cause exists that a particular dwelling is a particular felon's residence. Otherwise, the discretion that the court feared is passed directly back to the officer on the street, who " 'in the often competitive enterprise of ferreting out

crime,' ... may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty and the privacy of his home." *Steagald,* 451 U.S. at 212, 101 S.Ct. at 1647 (quoting *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)).

■ In fact, in this case, Magistrate Washington did make a judicial determination of the target's home—and found that there was reason to believe that he lived at a different address—at the government's initial application for an arrest warrant. Indeed, the standard arrest warrant form used every time an application for an arrest warrant is made contains a space to enter the target's address. The warrant is issued for a particular person whose address is a particular place. Under *Payton,* at that address, the government can execute the warrant by entering and arresting the target. It is not necessary to have a search warrant as well.

■ However, when the agents come to believe that there is probable cause that the target lives instead at a different address from the one listed on the warrant, they do not have a roving commission to execute the arrest warrant there. The logic of *Steagald* directs that they must appeal to a judicial officer again.

In practical terms, this is not a burdensome requirement to place on the authorities. As *Steagald* itself noted, the Federal Rules of Criminal Procedure explicitly provide for the application for a telephonic warrant based on oral testimony. 451 U.S. at 222, 101 S.Ct. at 1652; *see also* Fed.R. Crim.P. 41(c)(2) (provision for telephonic warrant). In this case, Agent Marin made at least two other telephone calls before executing the warrant, one of which was to the Superintendent to get permission to use his Assistant Superintendent as a decoy to gain entrance or to get a key. There were two teams of agents already there to seal off the area, it was still very early in the morning, and no signs of activity had been observed in the apartment.

At argument, the government has urged that this construction of *Steagald* would place an undue burden on them, particularly when a drug offender is a fugitive.[2] They submit that the nature of such a fugitive is to be constantly on the move, in essence, that a drug fugitive "lives" many places, so that it would be impracticable to obtain a warrant directed at any specific place. In other words, the government maintains that it can get around the *Steagald* rule altogether by a finding of probable cause that one "lives" in a dwelling rather than "visiting" it, and that—as a matter of definition—a fugitive "lives" wherever he happens to hang his hat for the night. The weight that the government puts on the fact that Enrique was a fugitive points directly to the "potential for abuse" that the Supreme Court feared in *Steagald:* "Armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances." 451 U.S. at 215, 101 S.Ct. at 1649.

The government cannot avoid a Supreme Court holding by substituting one magic word for another. The interest sought to be protected by the *Steagald* rule is the privacy of the dwelling and those who live there. When a judicial officer has found that the target of a warrant lives at a certain address, that arrest warrant can be executed at that address pursuant to *Payton.* As the Supreme Court subsequently summarized the holding of *Payton:* "Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." *Steagald,* 451 U.S. at 214 n. 7, 101 S.Ct. at 1649 n. 7. However, when the arrest warrant lists no address, or when it lists an address other than the one the officers seek to enter, the privacy interests of third parties are strongly implicated. An arrest warrant cannot be executed at a third party's home because, "[s]uch a warrant embodies *no judicial determination whatsoever* regarding the person whose home is to

be searched." *Id.* (emphasis added). To protect third parties and to give effect to the logic of *Steagald,* it must be a judicial officer, not the police officer on the scene, who decides whether there is reason to believe that a felon lives in a particular dwelling.

The government has cited Second Circuit cases which are said to lead to a contrary conclusion. First, is *United States v. Spencer,* 684 F.2d 220 (2d Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). In *Spencer,* however, the question raised and answered by the Court was whether the suspect was *at* his home at the time of the entry, which is another of the requirements of *Payton,* 445 U.S. at 602–03, 100 S.Ct. at 1388, not whether a magistrate had determined that there was reason to believe that a certain dwelling was his home. Thus the government's reliance is inapt. Exactly the same is true in *United States v. Terry,* 702 F.2d 299 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), in which, again, the issue raised was whether the police had reason to believe that the defendant was at home, not whether the home was his. Consequently, in those cases the issue here was neither raised nor decided. Indeed in neither *Payton* nor *Terry* do the facts reflect that the targets' addresses were omitted from the arrest warrants, or, as is the case here, that the officers, without the approval of a judicial officer, consciously decided to execute the warrants at an address different from the one listed on the face of the warrant.

The government also relies on *United States v. Manley,* 632 F.2d 978 (2d Cir. 1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). *Manley,* however, was decided before *Steagald,* when the law of this Circuit was that the police could, indeed, enter a third party's dwelling to execute an arrest warrant if they had "reasonable belief" that their target was within. *Id.* at 983. As already discussed, *Steagald* now forecloses the result reached there.

---

**2.** The government also unsuccessfully made virtually precisely this argument to the Supreme

Court in *Steagald,* 451 U.S. at 220–23, 101 S.Ct. at 1652–53.

Finally, the government has cited two cases from other circuits, *United States v. De Parias*, 805 F.2d 1447, 1457 (11th Cir. 1986), *cert. denied*, — U.S. —, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987), and *Washington v. Simpson*, 806 F.2d 192, 196 (8th Cir.1986), for support of the proposition that a magistrate need not pass on an officer's determination that probable cause exists that the target of an arrest warrant resides at a dwelling before the officer executes the warrant at that dwelling. Of the two cases, *Washington* does not cite *Steagald* at all, or in any way recognize that *Payton* might be read in tandem with it. The court in *De Parias* does cite *Steagald* and does adopt the position of the government here. However, the opinion is barren of any discussion of the interests that the *Steagald* Court was seeking to protect. I decline to follow either case. The question of when a dwelling is someone's "home" can be a difficult factual and legal issue, as Enrique's situation shows. Vesting the decision in the hands of police officers on the scene would subvert the interests that the *Steagald* rule protects. For instance, had Quintas listed five or six different dwellings among which, he said, Enrique-the-fugitive regularly rotated, it should not be the officers' job to decide whether this information is enough to decide whether Enrique "lives" at any—or at all—of these "homes," and consequently to execute the arrest warrant at them. Indeed, the evidence here establishes that Enrique did not "live" at 4601 Henry Hudson Parkway, Apartment A–8, that, in fact, he lived nowhere and everywhere. Enrique, as do so many fugitives, stayed wherever he could.

The facts here are not so far from the facts in *Steagald*. There the officer had probable cause to believe that a fugitive would be at a specific address for twenty-four hours. Under the theory that the government now urges, in essence that a fugitive "lives" wherever he sleeps, law enforcement officers can avoid the *Steagald* rule altogether simply by "finding" that a target "lives" at the address that they wish to search, and the *Steagald* rule

and the magistrate would be read entirely out of the picture.

The court notes that the government has not claimed that this case falls within the good faith exception of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), perhaps because it considered that it could not meet the threshold "objectively reasonable" test, *id.* at 922–23, 104 S.Ct. at 3420, because the face of the warrant explicitly listed a different dwelling as the target's residence, as did the underlying affidavit.

■ Similarly, the government has not disputed Nezaj's contention that if the agents' initial breaking down the door was illegal then the items at issue are fruits of an illegal entry which must consequently be suppressed. Even if the government argued that Nezaj's intervening arrest breaks the chain begun by the illegal entry (which it has not), the result would be the same. The rule in this Circuit is "When police officers have lawfully entered premises to effect an arrest, they are entitled to make a 'quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers.'" *United States v. Vasquez*, 638 F.2d 507, 530 (2d Cir.1980) (Kearse, J.) (quoting *United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981)), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981). During such a security check, officers are entitled to seize items in plain view. *Gomez*, 633 F.2d at 1008.

In *Vasquez*, the Honorable Amalya L. Kearse, writing for the court, upheld a district court decision admitting evidence that was in plain view during a security check, but suppressing items that were the result of "a thorough search of the premises." 638 F.2d at 532. The district court had ruled "that 'once the officers entered the apartment and made a cursory examination to determine whether any persons were present their activities should have ceased,'" and, consequently, the court suppressed items seized from inside a cabinet

and a gun found under a mattress. *Id.* at 518–19.

■ Here, assuming that the entry to arrest Nezaj was lawful, (as opposed to the agent's initial entry), the agents would be justified under *Vasquez* in making a security sweep of apartments A–7, A–8, and the crawl space, and they did so. But having secured the area, the officers should have obtained a warrant before conducting a more thorough search. According to Agent Blahato's affidavit, they did not do this. Instead, later in the day, and apparently without a warrant, the officers were conducting a more extensive examination in which they were trying to reconstruct the shooting. In the course of this more thorough examination, the officers discovered the heroin, scale, guns, and ammunition. At an earlier hearing it was revealed that the heroin, for instance, was discovered *inside* a safe, obviously beyond the scope of a limited security check for third persons. Largely on the basis of what they discovered during this warrantless search, Agent Blahato finally swore out an affidavit and applied for and received a warrant to seize the items. Even though finally seized pursuant to a warrant, the items are, nonetheless, fruits of the previous illegal search that followed the security sweep.

Finally, the government has not argued that the items fall within the inevitable discovery exception to the exclusionary rule that was enunciated in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). *See also United States v. Pimentel,* 810 F.2d 366, 368–69 (2d Cir.1987). The government's sole argument has been that the initial breaking-in was authorized by the arrest warrant.

**B. Suppression of Statements**

Nezaj has also moved for the suppression of statements that he made in trying to surrender, which, according to him, fall within the rule of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After the shooting, Nezaj crawled through a passageway in the attic to a neighboring apartment in the building. By this time, additional teams of police had arrived, surrounded the building, and cordoned off a significant part of the area. From his place of retreat, Nezaj called 911 and asked to speak to an officer who was on the scene, identifying himself as the "suspect." While the statements at issue are, themselves, largely innocuous, the government intends to introduce them to show the calm tone of Nezaj's voice to rebut what they anticipate to be his defense that he shot the officer in self-defense because of his panicked state. Consequently, the statements may be of considerable importance.

The two issues here are whether Nezaj was "in custody" for the purposes of *Miranda,* and, if so, whether his statements resulted from "questioning initiated by law enforcement officers," *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, or rather were volunteered statements, *id.* at 478, 86 S.Ct. at 1630.

The Supreme Court has said that custody for *Miranda* purposes occurs when there has been "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). Thus custody for *Miranda* purposes encompasses more than formal arrest alone.

For instance, in the slightly different context of determining whether an offender had been taken into "custody" before law enforcement officials had probable cause to do so, the Second Circuit has ruled that the offender was taken into custody when Secret Service Agents appeared at his place of work, displayed their badges, asked him with a sense of urgency to leave work early and come with them for questioning, and insisted that he do so in their car instead of his own. *United States v. Ceballos,* 812 F.2d 42 (2d Cir.1987).

On the other hand, the Circuit has ruled that a district court was not clearly erroneous in finding that, for *Miranda* purposes, a defendant was not in custody when agents went to his place of business to

execute a search warrant, and told him that he was free to leave, but that if he remained he would be accompanied at all times during the search by an agent. *United States v. Ross*, 719 F.2d 615 (2d Cir.1983).

Other circuits have developed elaborate tests for determining when a defendant has been constructively taken into custody. For instance the Fifth Circuit looks to the following indicia:

(1) whether probable cause to arrest had arisen, (2) whether the subjective intent of the officer conducting the interrogation was to hold the defendant, (3) whether the subjective belief of the defendant was that his freedom was significantly restricted, and (4) whether the investigation had focused on the defendant at the time of the interrogation.

*United States v. Warren*, 578 F.2d 1058, 1071 (5th Cir.1978) (en banc), *reh'g denied in part*, 586 F.2d 608 (5th Cir.1978), *aff'd en banc in relevant part*, 612 F.2d 887 (5th Cir.), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).

If these elements were viewed in a literalistic way, it is conceivable that Nezaj under these circumstances might meet the test. However, counsel has not pointed to a single case in this circuit in which restriction on movement was so physically removed. For instance, while the officers actions showed that they believed that Nezaj was probably still somewhere within the apartment building, they did not know exactly where. So while Nezaj might not have been able to walk out the front door and down the street, he was not, and had never been, under the kind of control described in *Ceballos*, in which agents were constantly at the defendant's side, giving unmistakable signals—explicitly and through carefully orchestrated silences—that he was to do exactly as they directed.

■ It is unnecessary, however, to reach the "custody" issue because Nezaj's statements were volunteered. *Miranda* addressed "interrogations," defined as "ques-

tioning *initiated by* law enforcement officers." 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added). In particular, *Miranda* was explicit that the ruling did not affect volunteered confessions: "There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478, 86 S.Ct. at 1630 (footnote omitted).

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court elaborated on what it meant by interrogation:

[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

446 U.S. at 301, 100 S.Ct. at 1689 (footnotes omitted).

This expansion of the doctrine, however, does not affect this case. Here, Nezaj placed the call on his own, and the questions asked by the officer who answered the call were directed at establishing the telephone link with the officers on the scene and keeping Nezaj from hanging up in the meantime. Consequently, Nezaj's statements will not be suppressed.

### C. Exclusion of Tapes

On the government's representation that it will not seek to introduce at trial the tapes at issue, Nezaj's application is denied.

### D. Bill of Particulars

In this case, there has been an extensive bail detention hearing before a Magistrate, two days of hearing and argument on detention before this court, and another hear-

ing before this court on the issue of suppression. The government's theory of the case is apparent, not only from all of those proceedings but also from the discovery that the government has provided. Nezaj has sufficient detail to prepare his defense. As Nezaj acknowledges, a court has broad discretion in ruling on requests for bills of particulars, *Will v. United States*, 389 U.S. 90, 98–99, 88 S.Ct. 269, 275, 19 L.Ed.2d 305 (1967), and the motion is denied.

**E. Discovery Requests**

Nezaj has made certain discovery requests, many of which the government has already complied with, and others of which it has represented that it will comply with in a timely manner. In the event that the government fails to do so, Nezaj has leave to renew his application at trial.

■ With respect to Nezaj's request for a witness list, he is not entitled to one in the absence of "some particularized showing of need, beyond the obvious assertion that such a list would facilitate preparation for trial." *United States v. Pastor*, 419 F.Supp. 1318, 1330 (S.D.N.Y.1975), *aff'd*, 557 F.2d 930 (2d Cir.1977). Nezaj has not made such a particularized showing, and his application is, consequently, denied.

**Conclusion**

For the foregoing reason, Nezaj's application to suppress physical evidence is granted, and all other motions denied.

IT IS SO ORDERED.