Luis E. DURAN, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 45A03–0811–CR–569.

Court of Appeals of Indiana.

July 23, 2009.

Transfer Granted Oct. 1, 2009.

Alison L. Benjamin, Paul G. Stracci, Thiros & Stracci, P.C., Merrillville, IN, Attorneys for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

### Case Summary and Issue

Luis Duran brings this interlocutory appeal following the trial court's denial of his motion to suppress evidence seized during a search of his apartment. On appeal, Duran raises one issue, which we restate as whether the trial court properly concluded that the police officers' entry into Duran's apartment did not violate the Fourth Amendment of the United States Constitution or Article I, Section 11, of the Indiana Constitution. Concluding the trial court's decision was not improper, we affirm.

### Facts and Procedural History

On the afternoon of March 4, 2007, Officer David Gemeinhart of the East Chicago Police Department attempted to serve Nelson Hernandez with an arrest warrant at the address listed on the warrant, 3902 Butternut, East Chicago, Indiana. The warrant was based on a recent incident where Hernandez allegedly stole a vehicle and was injured when the vehicle crashed during the course of a police chase. Upon arrival at 3902 Butternut, Officer Gemeinhart spoke with Hernandez's mother, who told him that Hernandez was living in "the Harbor," which is apparently a neighborhood of East Chicago, though the record is not entirely clear on this point. Transcript at 50.

Later that evening, Officer Gemeinhart spoke with Officer Samuel Maldonado, who was familiar with Hernandez, in an attempt to determine his whereabouts. Fortuitously, Officer Maldonado told Officer Gemeinhart that he had given Hernandez a ride from the hospital to an East Chicago apartment building on the corner of Broadway and Elm several days earlier and just prior to the issuance of the arrest warrant. Officer Maldonado also told Officer Gemeinhart that Hernandez was in a cast and on crutches and that when the two arrived at the apartment building, he waited outside with Hernandez until a woman—Officer Maldonado thought it was Hernandez's mother—opened the door and helped Hernandez into the building with his belongings.

Around 11:00 p.m. that evening, Officers Gemeinhart and Maldonado, along with Officer Kevin Harretos, went to the apartment building on Broadway and Elm. Shortly after their arrival, the officers spoke with a man who claimed to

know Hernandez. The record is not entirely clear how the officers came into contact with the man—Officer Harretos testified the man answered the locked door to the commons area of the apartment building in response to the officers' knocks, while Officer Gemeinhart testified the man was standing near a door to a bar that was connected to the apartment building—but there is no dispute the man claimed to know Hernandez. Specifically, when Officer Gemeinhart showed the man a photograph of Hernandez and asked if the person depicted in the photograph was Hernandez, the man responded affirmatively. When asked if he knew where Hernandez lived, the man said he lived in a second-floor apartment with a green door and added, "It's the only apartment up there that has a green door on it." *Id.* at 57.

Based on this information, the officers entered the apartment building, climbed a flight of stairs, located the green door, and confirmed it was the only green door on the second floor. The officers also observed that the apartment building lacked typical means of identification such as mailboxes and room numbers. Officer Gemeinhart knocked on the green door and a man from inside the apartment asked, "Who is it?" *Id.* at 65. Officer Gemeinhart identified himself, and the man said, "Hold on a minute." *Id.* The officers then heard a "shuffling around" from inside the apartment followed by silence. *Id.* After knocking for several minutes without receiving a response, Officer Gemeinhart told the occupant that if the door was not opened, he would kick it in. After several more minutes passed without receiving a response, Officer Gemeinhart kicked the door in and entered the apartment. Duran was standing in the entryway, and Officer Gemeinhart asked him if Hernandez was in the apartment. Duran replied, "He doesn't live here. You can search, he's not here," so the

officers searched the apartment and confirmed Hernandez was not there. *Id.* at 67. The officers did, however, observe a bag of cocaine on the bedroom window sill, along with baggies that were believed to be used as packaging material for the cocaine. The officers seized these items and placed Duran under arrest. Shortly thereafter, the officers knocked on the remaining two second-floor apartment doors. Hernandez's aunt answered one of them (the record is not entirely clear which) and confirmed Hernandez was inside; he was arrested shortly thereafter.

On August 3, 2007, the State charged Duran with Class A felony dealing in cocaine and Class C felony possession of cocaine. On April 2, 2008, Duran filed a motion to suppress, alleging that the entry into his apartment violated the Fourth Amendment of the United States Constitution and Article I, Section 11, of the Indiana Constitution. On June 19, 2008, the trial court conducted a hearing on the motion, hearing testimony from Officers Harretos, Gemeinhart, and Maldonado. Based on this evidence, the trial court denied Duran's motion. Duran now appeals.

### Discussion and Decision

#### I. Standard of Review

This court reviews the trial court's denial of a motion to suppress evidence for an abuse of discretion. *Mast v. State*, 809 N.E.2d 415, 418 (Ind.Ct.App. 2004), trans. denied. An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Cochran v. State*, 843 N.E.2d 980, 983 (Ind.Ct. App.2006), *trans. denied, cert. denied,* 549 U.S. 1122, 127 S.Ct. 943, 166 L.Ed.2d 722 (2007). In conducting this review, we consider conflicting evidence in a light most favorable to the trial court's ruling, but also consider uncontested evidence favor-

able to the defendant. *Smith v. State,* 780 N.E.2d 1214, 1216 (Ind.Ct.App.2003), *trans. denied.*

## II. Propriety of Trial Court's Decision

### A. Fourth Amendment Violation

■■■ Duran argues the police officers' entry into his apartment violated the Fourth Amendment. The Fourth Amendment states in relevant part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The purpose of this provision is to protect people from unreasonable search and seizure, and it applies to the states through the Fourteenth Amendment. *Krise v. State,* 746 N.E.2d 957, 961 (Ind.2001) (citing *Mapp v. Ohio,* 367 U.S. 643, 650, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). The remedy for a violation of the Fourth Amendment is to render inadmissible any evidence seized during the illegal search. *Mapp,* 367 U.S. at 654–55, 81 S.Ct. 1684.

In *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the United States Supreme Court held that the Fourth Amendment prohibits police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. As a corollary to this holding, the Court recognized that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603, 100 S.Ct. 1371. The Court reasoned that this limited authority was constitutionally permissible because a detached magistrate had already determined there was sufficient cause to arrest the suspect, and that determination outweighed any privacy interest the suspect might have in refusing entry into his home. *See id.* at 602–03, 100 S.Ct. 1371. The

Court refined this rule a year later in *Steagald v. United States,* 451 U.S. 204, 212, 215–16, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), holding that absent exigent circumstances, an arrest warrant does not give police officers the authority to conduct a nonconsensual search of the dwelling of a person not named in the warrant.

■■■ The federal circuit courts of appeal have interpreted the holdings of *Payton* and *Steagald* as permitting police officers to enter a dwelling if the evidence establishes the officers are sufficiently certain of the following: 1) that the arrestee resided at the dwelling and 2) that the arrestee was at the dwelling at the time of entry. *See, e.g., United States v. Bervaldi,* 226 F.3d 1256, 1263 (11th Cir.2000). The circuit courts are split, however, regarding what level of certainty is required under both prongs. *Cf. Todosijevic v. County of Porter, Ind.,* 2005 WL 3279387, at *4 (N.D.Ind., Dec.2, 2005) ("[O]ne question still remained after *Payton* and *Steagald:* if an officer, armed with an arrest warrant for one individual, may only lawfully enter *that* individual's home without an additional search warrant, how sure must an officer be that the home he is entering belongs to the individual named in the arrest warrant?" (emphasis in original)). Seizing on the "reason to believe" language of *Payton,* a majority of circuit courts have interpreted the holdings of *Payton* and *Steagald* as requiring a "reasonable belief," which is a less exacting standard than probable cause. *See, e.g., United States v. Thomas,* 429 F.3d 282, 285–86 (D.C.Cir. 2005), *cert. denied,* 549 U.S. 1055, 127 S.Ct. 660, 166 L.Ed.2d 519 (2006); *United States v. Bervaldi,* 226 F.3d 1256, 1263 (11th Cir. 2000); *Valdez v. McPheters,* 172 F.3d 1220, 1225 (10th Cir.1999); *United States v. Lovelock,* 170 F.3d 339, 343 (2d Cir.1999), *cert. denied,* 528 U.S. 853, 120 S.Ct. 134, 145 L.Ed.2d 114 (1999); *United States v.*

*Route,* 104 F.3d 59, 62 (5th Cir.1997), *cert. denied,* 521 U.S. 1109, 117 S.Ct. 2491, 138 L.Ed.2d 998 (1997); *see also* 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.1(a), at 265 (4th ed. 2004) ("Just what [the reason-to-believe] standard means continues to be a matter of considerable uncertainty, though it is generally accepted that [it] involves something less than the traditional probable cause standard." (footnote omitted)). The Ninth Circuit stands alone among the federal circuits in its interpretation of *Payton* and *Steagald* as requiring probable cause. *See Motley v. Parks,* 432 F.3d 1072, 1080 (9th Cir.2005) (en banc); *United States v. Gorman,* 314 F.3d 1105, 1111–15 (9th Cir.2002).[1]

We acknowledge there is some merit to the Ninth Circuit's position. *See State v. Smith,* 208 Ariz. 20, 90 P.3d 221, 225 (Ariz. Ct.App.2004) (adopting the Ninth Circuit's probable cause standard in part because survey of Supreme Court opinions suggested "reason to believe" was synonymous with "probable cause"), *review denied.* However, to borrow from the D.C. Circuit's observation, "We think it more likely ... that the Supreme Court in *Payton* used a phrase other than 'probable cause' because it meant something other than 'probable cause.'" *Thomas,* 429 F.3d at 286; *see also United States v. Magluta,* 44 F.3d 1530, 1534 (11th Cir.1995) ("The strongest support for a lesser burden than probable cause remains the text of *Payton,*

and what we must assume was a conscious effort on the part of the Supreme Court in choosing the verbal formulation of 'reason to believe' over that of 'probable cause.'"), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995).

Thus, applying the standard of review adopted by the majority of the circuit courts, the question becomes whether the trial court abused its discretion when it determined the officers reasonably believed: 1) that Hernandez resided at the green-door apartment and 2) that Hernandez was at that apartment at the time the officers entered. In resolving this question, we consider the totality of the facts and circumstances within the officers' knowledge prior to the entry. *See id.; see also Bervaldi,* 226 F.3d at 1263 (observing that "common sense factors" should inform the "reasonable belief" prongs as articulated in *Payton* ). We also emphasize a point that is implicit in the foregoing reasonable belief standard and particularly relevant to this case, namely, "the officers' assessment need not in fact be correct; rather, they need only 'reasonably believe' that the suspect resides at the dwelling to be searched and is currently present at the dwelling." *Risse,* 83 F.3d at 216; *see also* 3 LaFave, *supra,* § 6.1(b), at 283 (noting that it would create "an incredible Catch–22 situation" if the standard for determining a valid entry pursuant to *Payton* and *Steagald* was whether

---

1. Among the remaining circuits, the First and Eighth appear to have adopted the reasonable belief standard, but have done so without mentioning the probable cause standard. *See United States v. Graham,* 553 F.3d 6, 12 (1st Cir.2009), *cert. denied,* — U.S. —, 129 S.Ct. 2419, 173 L.Ed.2d 1323 (2009); *United States v. Risse,* 83 F.3d 212, 216 (8th Cir. 1996). The Third, Sixth, and Seventh Circuits have noted the split, but have yet to weigh in. *See United States v. Veal,* 453 F.3d 164, 167 n. 3 (3d Cir.2006); *United States v. Hardin,* 539 F.3d 404, 416 (6th Cir.2008);

*Covington v. Smith,* 2008 WL 83843, at *3, 259 Fed.Appx. 871 (7th Cir.2008), *cert. denied,* — U.S. —, 129 S.Ct. 99, 172 L.Ed.2d 82 (2008). Research has revealed one district court opinion from the Fourth Circuit adopting the reasonable belief standard. *See Smith v. Tolley,* 960 F.Supp. 977, 985–88 (E.D.Va. 1997). We also note that most state courts appear to have adopted the reasonable belief standard. *See Commonwealth v. Silva,* 440 Mass. 772, 802 N.E.2d 535, 540 n. 7 (2004) (collecting cases).

the dwelling was in fact the arrestee's, as opposed to whether the officers reasonably believed it was the arrestee's dwelling).

 Regarding the first prong, whether the officers reasonably believed Hernandez resided at the green-door apartment, the record indicates that the only information the officers received on this point came from an unidentified man, who positively identified Hernandez from a photograph and told the officers Hernandez "stays" in the only green-door apartment on the second floor.[2] Tr. at 57. Research has disclosed at least one opinion concluding that officers reasonably believed an arrestee resided at a dwelling based solely on information provided by a third party. In *United States v. Lauter,* 57 F.3d 212, 214 (2d Cir.1995), police officers attempting to serve an arrest warrant at an apartment building learned from a confidential informant whose father was the landlord that the arrestee had relocated to a basement unit in the same building. In concluding the officers reasonably believed the arrestee resided in the basement unit, the court noted that the informant had been reliable in the past and that the informant's father was the building's landlord. 57 F.3d at 215. Although the court did not explicitly state so, the latter point was apparently a reasonable basis for informing the officers' belief because it is sensible to infer that landlords know who reside in their units. *Cf. Lovelock,* 170 F.3d at 344 (concluding police officers reasonably believed arrestee resided in the attic of a two-family home because the arrestee reported the home's address as part of his probationary duty and because two tenants positively identified a photograph of the arrestee and stated he lived in the attic).

 We acknowledge the officers in this case knew less about the unidentified man than the officers in *Lauter* knew about their informant. As Duran points out, the officers made no attempt to determine the man's identity, nor did they ask the man why he thought Hernandez resided in the green-door apartment. Nevertheless, we do not think such an absence of information necessarily means the officers' belief was unreasonable. Our supreme court has observed in another Fourth Amendment context that the reliability of information provided by third parties turns in part on whether the party is a "professional informant" or "cooperative citizen." *See Kellems v. State,* 842 N.E.2d 352, 356 (Ind.2006) (discussing the reliability of third parties in the context of reasonable suspicion to support a Terry stop), *reh'g granted on other grounds,* 849 N.E.2d 1110. Those meeting the former description warrant scrutiny because they provide information in exchange for a reward, such as money or leniency, *see Paw-*

---

**2.** To take a step back, we note it was certainly reasonable for the officers to believe Hernandez resided somewhere in the apartment building because Officer Gemeinhart confirmed from Hernandez's mother that he was not living at the warrant address (3902 Butternut) and, more significantly, Officer Maldonado dropped Hernandez off at the building with his belongings and observed a woman help him inside. Standing alone, however, a reasonable belief that Hernandez resided *somewhere* in the building does not authorize entry into each individual unit. *Cf. United States v. Winsor,* 846 F.2d 1569, 1572 (9th Cir.1988) ("[E]ach room of the hotel ... en-joyed its own zone of Fourth Amendment protection, and [defendant's] expectation of privacy was not reduced simply because he lived in a single room in a low-rent hotel rather than in a single-family house or apartment.") (en banc); *see also United States v. Acosta,* 965 F.2d 1248, 1259 (3d Cir.1992) ("While law enforcement officials have a right to conduct reasonable investigations into criminal activity, a plan by officers to demand entry into every apartment in a multi-unit dwelling in order to locate the subject of an arrest warrant is neither reasonable nor within the purview of Fourth Amendment teachings.") (Cowen, J., dissenting).

loski v. State, 269 Ind. 350, 354, 380 N.E.2d 1230, 1232 (1978), whereas those meeting the latter description are deserving of a "greater indicia of reliability" because they usually provide information not for self-gain, but to help the police solve crimes, Kellems, 842 N.E.2d at 356; cf. United States v. Burbridge, 252 F.3d 775, 778–79 (5th Cir.2001) (observing, in the context of discussing whether there was probable cause to conduct a warrantless search of defendant's motorcycle, that where "an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case" (citation omitted)).

Here, the record indicates the unidentified man is more accurately described as a cooperative citizen than a professional informant. Officer Harretos testified the man answered the locked door to the commons area of the apartment building in response to the officers' knocks,[3] which suggests the initial encounter was a chance occurrence, not an attempt by the man to offer information in exchange for a reward. Although the man's initial identification of Hernandez could be considered questionable because it was in response to a leading question (i.e., Officer Gemeinhart testified he asked the man if he knew Hernandez and then showed him a photograph of Hernandez), his subsequent explanation that Hernandez resided in the only green-door apartment on the second floor was particularly descriptive because the building lacked typical means of identifying individual units, such as mailboxes and room numbers. Moreover, prior to entering, the officers corroborated part of the man's story, both through Officer Maldonado's reasonable belief that Hernandez resided somewhere in the building, see supra, note 2, and, more specifically, by confirming there was only one green-door apartment on the second floor, see Kellems, 842 N.E.2d at 356 (indicating the witness was reliable in part because police officers corroborated her story). Finally, Officer Gemeinhart testified the man requested that the officers not reveal his identity to Hernandez because he "didn't want to be in trouble with him." Tr. at 62. Although we acknowledge, as Duran puts it, that it is reasonable to infer from such a statement that the man may have "had an axe to grind with Duran," an equally reasonable inference, viewing the evidence in a light most favorable to the trial court's ruling, as we must, Smith, 780 N.E.2d at 1216, is that the man was willing to provide the officers with information despite his perception that doing so ran the risk of reprisal. Considering the totality of the circumstances, and particularly the information provided by the unidentified man, we conclude the officers' belief that Hernandez resided at the green-door apartment was a reasonable one.

■ Regarding the second prong, whether the officers reasonably believed Hernandez was at the apartment at the time of entry, the record indicates that prior to the entry, the officers knew that Hernandez was relatively immobile because Officer Maldonado observed him in a cast and on crutches. Indeed, Officer Maldonado testified that a woman had to help him into the building with his belongings. When Officer Gemeinhart knocked on the green door, a man from inside requested that Officer Gemeinhart identify himself.

---

3. As mentioned above, the evidence on this point is conflicting, as Officer Gemeinhart testified the officers initially saw the man standing outside the door to a bar that was connected to the apartment building. Our standard of review, however, requires us to resolve conflicting evidence in a light most favorable to the trial court's ruling. Smith, 780 N.E.2d at 1216.

When Officer Gemeinhart complied, the man said, "Hold on a minute." Tr. at 65. Based on this response, the officers could have reasonably inferred the man was preparing to answer the door. Instead, the officers heard a "shuffling around" from inside the apartment and then silence. *Id.* For several more minutes, Officer Gemeinhart continued knocking on the door, but did not receive a response.

Courts addressing whether officers reasonably believed the arrestee was at the dwelling in question at the time of entry have observed that a reviewing court "must be sensitive to common sense factors indicating a resident's presence," *Magluta*, 44 F.3d at 1535, including "the fact that a person involved in criminal activity may be attempting to conceal his whereabouts," *Valdez*, 172 F.3d at 1226. Given Hernandez's status as an arrestee, his relative immobility, the man's non-responsiveness to Officer Gemeinhart's knocks despite telling the officers minutes earlier to "[h]old on a minute," tr. at 65, and the "shuffling around" from inside the apartment, *id.*, the officers could have reason-

ably concluded that the man was Hernandez or that he was helping Hernandez hide. *Cf. Montgomery v. State*, 904 N.E.2d 374, 380 (Ind.Ct.App.2009) (concluding, in the context of whether exigent circumstances justified officers' warrantless entry into a hotel room, that although a lack of response to the officers' knocks alone would not have authorized the entry, it was justified because the officers had reliable information from a co-occupant that the person in the room was in danger), *trans. pending.* Either way, the evidence supports a conclusion that the officers reasonably believed they would find Hernandez inside the apartment when they entered.

 Having concluded the officers reasonably believed that Hernandez resided at the green-door apartment and that he was at the apartment when the officers entered, it follows that their entry was permissible pursuant to *Payton* and *Steagald*.[4] Accordingly, the trial court was within its discretion when it concluded the officers' entry did not violate the Fourth Amendment.[5]

---

4. We note in closing that the principal case on which Duran relies, at least to the extent it is factually analogous to the instant case, *United States v. Nezaj*, 666 F.Supp. 494 (S.D.N.Y.1987), predates the two-prong interpretation of *Payton* and *Steagald* as formulated by the federal circuit courts of appeal. Instead, the district court in *Nezaj* appears to have interpreted *Payton* and *Steagald* as applying separately depending on whether the dwelling in question was named in the arrest warrant. *See* 666 F.Supp. at 499 ("When a judicial officer has found that the target of a warrant lives at a certain address, that arrest warrant can be executed at that address pursuant to *Payton* .... However, when the arrest warrant lists no address, or when it lists an address other than the one the officers seek to enter, the privacy interests of third parties are strongly implicated.... To protect third parties and to give effect to the logic of *Steagald*, it must be a judicial officer, not the police officer on the scene, who decides

whether there is reason to believe that a felon lives in a particular dwelling."). Subsequent cases from the Second Circuit have noted, however, that "*Steagald* did not ... prohibit entry into a residence reasonably believed to belong to the person named in the arrest warrant" regardless of whether the residence was listed in the warrant. *Lovelock*, 170 F.3d at 344. Accordingly, the Second Circuit has suggested that *Nezaj* should either be "read narrowly to apply only where the identity of the suspect is established in part by his address" or rejected altogether "as unsound and inconsistent with Payton and its progeny." *Lauter*, 57 F.3d at 216.

5. The dissent would conclude the officers' entry into Duran's apartment violated the Fourth Amendment, apparently because the trial court's conclusion to the contrary runs afoul of *Steagald's* admonition that allowing police officers to " 'decide when there is sufficient justification for searching the home of a

## B. Article I, Section 11, Violation

 Duran argues the officers' entry into his apartment violated Article I, Section 11, of the Indiana Constitution. Article I, Section 11, states in relevant part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated...." Although this provision derives from and shares nearly the same language as the Fourth Amendment, our supreme court has stated that it will interpret and apply Section 11 independently from Fourth Amendment jurisprudence. *See Litchfield v. State*, 824 N.E.2d 356, 360–61 (Ind.2005). "Rather than looking to federal requirements such as warrants and probable cause when evaluating Section 11 claims, we place the burden on the State to show that under the totality of the circumstances its intrusion was reasonable." *State v. Bulington*, 802 N.E.2d 435, 438 (Ind.2004). This "reasonableness" inquiry turns on the following non-exclusive factors: 1) the degree of concern, suspicion, or knowledge that a violation has occurred; 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and 3) the extent of law enforcement needs. *Litchfield*, 824 N.E.2d at 361. Incorporating the standard of review mentioned above, the question becomes whether the trial court abused its discretion when it concluded the officers' entry into the apartment was reasonable pursuant to the Litchfield factors.

 Turning first to the second factor, the degree of intrusion, the State concedes, and we agree, that the officers' entry into Duran's apartment was a substantial intrusion. This is so because a person's dwelling is deserving of the highest degree of protection under Article I, Section 11. *See Willis v. State*, 780 N.E.2d 423, 428 (Ind.Ct.App.2002); cf. *United States v. United States Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed....")

---

third party for the subject of an arrest warrant' would 'create a significant potential for abuse.'" Dissent, op. at 1115 (quoting 451 U.S. at 215, 101 S.Ct. 1642). This admonition, however, does not extend to cases such as this one where the officers reasonably believe the arrestee resides at the dwelling in question. *See Motley*, 383 F.3d at 1063 (describing *Steagald* as "holding that officers could not enter and search the house of a third party simply because they had a 'reasonable ... belief' that the subject of an arrest warrant was a guest there; they had to have evidence that he was a co-resident" (quoting 451 U.S. at 213, 101 S.Ct. 1642)).

We also note that the dissent appears to take issue with the conflicts among the officers' testimony and the officers' claimed violation of Indiana Code section 35–33–5–7(d). Regarding the conflicting testimony, we have noted such conflicts in the foregoing discussion, but they are not relevant to determining whether the trial court abused its discretion because our standard of review requires us to resolve conflicting evidence in a light most favorable to the trial court's ruling. *Smith*, 780 N.E.2d at 1216. Also not relevant to determining a Fourth Amendment violation is the dissent's claim that the officers violated Indiana Code section 35–33–5–7(d), for state law does not affect the rights and remedies available under the federal constitution. *See Virginia v. Moore*, — U.S. —, —, 128 S.Ct. 1598, 1608, 170 L.Ed.2d 559 (2008); *see also Kyles v. State*, 888 N.E.2d 809, 812–13 (Ind.Ct.App.2008). Finally, the dissent states in closing, "I am deeply troubled by testimony indicating that police officers believe that when the resident of a dwelling does not open a door, after having simply heard the announcement that 'police' are outside, the officers may kick in that door to gain entry." Dissent, op. at 1115. We share the dissent's concern, but note that the officers' subjective beliefs are not relevant in evaluating an alleged Fourth Amendment violation. *See Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

Turning next to the first factor, the degree of concern, suspicion, or knowledge that a violation has occurred, we note initially the parties dispute whether the "violation" in this case pertains to the officers' knowledge that Hernandez committed a crime, or whether it refers to the officers' knowledge that Hernandez resided at the green-door apartment. We do not read *Litchfield* as applying the former interpretation because the court's application of this factor addressed whether the officers had reasonable grounds to suspect that contraband would be found in the defendants' trash. Stated differently, the inquiry turned on whether the officers had sufficient knowledge that the object of the search would be found at a particular place. In the context of the facts of this case, then, such an inquiry translates into whether the officers had reasonable grounds to believe Hernandez resided at the green-door apartment. However, given our conclusion above that the officers reasonably believed that Hernandez resided at the green-door apartment and that he was there when the officers entered, this factor favors a finding that the officers' conduct was reasonable.

Regarding the final factor, the extent of law enforcement needs, we note, as mentioned above, that the officers initially received a response from the man inside the apartment that suggested he was preparing to open the door, but the officers then heard some "shuffling around" followed by silence. Tr. at 65. Thereafter, the man was unresponsive to Officer Gemeinhart's repeated knocks. As was similarly observed in *Van Winkle v. State*, 764 N.E.2d 258, 264 n. 7 (Ind.Ct.App.2002), *trans. denied*, this case would be in "a very different search and seizure posture" had the man simply not responded to the officers' knocks or told them to go away because "[a]ttendant to [the common courtesy of opening the door] is the ability to exclude those who are knocking and preserve the integrity of the physical boundaries of the home," *Cox v. State*, 696 N.E.2d 853, 858 (Ind.1998). The man's subsequent conduct, however, gave rise to reasonable concern on the officers' part that he was Hernandez or that he was attempting to hide Hernandez.

Duran responds that the proper course for the officers under these circumstances would have been to apply for a search warrant. We acknowledge it certainly would have been reasonable for the officers to obtain a warrant (indeed, presumptively reasonable), but such an approach does not supply an answer to whether the approach the officers actually took was reasonable. In that regard, our supreme court has noted that "Indiana citizens have been concerned not only with personal privacy but also with safety, security, and protection from crime." *State v. Gerschoffer*, 763 N.E.2d 960, 966 (Ind.2002). Given the conspicuous nature of the man's conduct in response to the officers' knocks, we cannot say the officers' entry was inconsistent with safety, security, and protection from crime. Accordingly, the officers' needs favor a finding that their conduct was reasonable.

Applying the *Litchfield* factors, we are left with a substantial intrusion on the one hand, and, on the other hand, a reasonable belief on the officers' part that Hernandez was at the green-door apartment at the time of entry and conduct that was consistent with law enforcement needs. Because these factors in their totality favor a finding that the officers' conduct was reasonable, we cannot say the trial court abused its discretion when it concluded such conduct did not violate Article I, Section 11.

### Conclusion

The trial court properly concluded that the officers' entry into Duran's apartment did not violate the Fourth Amendment of the United States Constitution or Article I,

Section 11, of the Indiana Constitution. Accordingly, we affirm the trial court's denial of Duran's motion to suppress and remand for trial.

Affirmed and remanded.

BAILEY, J., concurs.

DARDEN, J., dissents with separate opinion.

DARDEN, Judge, dissenting, with separate opinion.

I respectfully dissent. As a starting point, I think it critical to remember that this began as a very late-night effort to serve a routine *arrest warrant* for Nelson *Hernandez*, who was sought on a charge of auto theft (not a crime of violence or a drug offense), and that it is undisputed that there was no "hot pursuit" or emergency here. Further, it appears from the record that Hernandez was relatively well known in the community to the police. The officers knew that in the course of his alleged crime, Hernandez had suffered a leg injury in a crash and was only recently released from the hospital—wearing a full cast and mobile only with the use of two crutches. The record contains no evidence of attempts by the officers to learn the name of Hernandez' aunt, to help narrow the location of her residence. Moreover, they knew that no matter where they located Hernandez, it was going to be in the residence of a third party in that building.

Next, I note the substantial number of facts upon which the officers' testimony differed. Specifically, their testimony differed as to the means by which they gained access to the apartment building, what happened when they were outside the door to Duran's apartment, and their actions upon entering his apartment.

As to their entry to the building, Gemeinhart said that he asked a man near a door to the building whether he knew Hernandez, and the man said he did, and that Hernandez was staying in the apartment upstairs with a green door; Gemeinhart could not remember how the officers had actually gained entry to the building. Haritos said that after knocking on a street-level door for seven to ten minutes, a 6′ 3″ 280–pound "scruffy" looking man "with real long hair" came to the door and opened it, (tr. 19); this man identified a picture shown to him by Gemeinhart as Hernandez, told them he was staying upstairs in the apartment with the green door, and let the officers in the building. According to Maldonado, a 5′ 10″ to 5′ 11″ 200–pound "neat looking" man "approached" the officers outside the building and asked whether he could help them, (tr. 86); when asked about Hernandez, this man indicated that Hernandez was in the apartment upstairs with the green door, and he opened the door to give them access to the building.

Once inside the apartment building, all officers agree that they went directly to the apartment with the green door, without checking any other units for Hernandez. However, as to what happened when they were outside the green door, their accounts again differ. Gemeinhart testified that he knocked and "announce[d], 'police department,'" and "right away, as soon as [he] knocked, 'a voice asked who was there'"; Gemeinhart answered, "the police, open the door,"; and shuffling noises were heard, then silence; Gemeinhart knocked again, and when there was no response, said "It's the police department, open the door. If you don't open the door it will be kicked in"; five minutes after his first knock, he kicks in the door. (Tr. 65, 66). According to Haritos, after Gemeinhart knocked "for a while," someone answered; Gemeinhart asks that the door be opened and is told to "hold on"; Gemeinhart asks for Hernandez, and is told to "hold on"; "walking around" is heard; then Gemeinhart knocks for five to ten

more minutes, with silence inside; Gemeinhart says, "Open the door, we need to talk to you" and that they are "looking for" Hernandez; Gemeinhart threatens to kick the door in if it is not opened; after another minute, Gemeinhart kicks the door in. (Tr. 25, 26). Maldonado testified that Gemeinhart first knocked for three to four minutes, saying "police, police"; then a voice asked who was at the door, and he answer, "police"; the voice said, "hold on," and then there was quiet; one to two minutes later, Gemeinhart kicked the door in. (Tr. 90, 91).

I note that Indiana law provides for a law enforcement officer to "break open" a dwelling door "in order to execute a search warrant, if he is not admitted following an announcement of his authority *and purpose.*" Ind.Code § 35–33–5–7(d) (emphasis added). However, there is *no* testimony that officers announced their purpose when they knocked on Duran's door, *i.e.,* that they were police officers with a warrant for the arrest of Hernandez. Here, the testimony only establishes that Gemeinhart announced himself as "police." The record suggests that Gemeinhart believed that such an identification was sufficient to justify the forcible entry. Specifically, Gemeinhart testified that his forcible entry was based on the following: Hernandez' mother told him that he was living in that neighborhood; Maldonado had recently dropped him off at that building; an unknown man at or near the building told him that Hernandez lived on the second floor apartment with a green door; and

> the simple fact that when I knocked on the door and the subject said, 'who is it?' and I said, 'police,' he would not open the door and I ha[d] been serving warrants long enough to know that if you're not wanted by the police, you should open the door if you don't have anything to hide or anyone to hide.
> (Tr. 70).

Next, I note the uncontradicted evidence that when they entered the apartment after Gemeinhart had kicked in the door, all three officers had their guns drawn. However, as to what happened once they entered the apartment, accounts again differ. According to Gemeinhart, he stayed with Duran while Haritos and Maldonado looked for Hernandez, and Haritos reported that "he found what he believed to be crack cocaine sitting on the window sill of the bedroom." (Tr. 69). Haritos testified that Gemeinhart remained with Duran while he and Maldonado looked through the small apartment for Hernandez, and in the bedroom he saw "a clear plastic bag with a white powdery substance" which he believed to be cocaine; after he and Maldonado confirmed that Hernandez was not in the apartment, he went to the bedroom "and retrieved it." (Tr. 34). According to Maldonado, he stayed with Duran, while Gemeinhart and Haritos looked for Hernandez; he heard them say "that they had narcotics, possible narcotics in plain view"; and the possible contraband "was pointed out to [him] on top of a dresser." (Tr. 94, 95).

As to the final event of the evening, all the officers agree that they located Hernandez at the first apartment door they knocked on after kicking in Duran's door and subsequently arresting him. They had arrested Duran based on finding some possible narcotic substance at some location in his apartment.

When I review the uncontradicted evidence (that there were no exigent circumstances, and the particulars concerning Hernandez and why he was being sought) and the substantial conflicts in the testimony of the officers, I cannot find that the totality of the circumstances justify the

officers' entry of Duran's apartment. *Steagald* warned that allowing "the police, acting alone and in the absence of exigent circumstances" to "decide when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant" would "create a significant potential for abuse." 451 U.S. at 215, 101 S.Ct. 1642. Further, *Steagald* concluded that using an arrest warrant "as authority to enter the homes of third parties" suffered from the infirmity of "leav[ing] to the unfettered discretion of the police the decision as to which particular homes should be searched," and that "the Framers of the Fourth Amendment" would not have "condoned such a result." *Id.*

In its argument to the trial court, the State asserted that entry was warranted because Hernandez might be escaping, or destroying evidence—such as keys, or documentation, or tools. However, it is undisputed that Duran's apartment was on the second floor, and the officers knew that Hernandez had a full cast and required two crutches to move about—thereby limiting his ability to escape from a second floor apartment. Further, I cannot find the possible destruction of evidence related to a charge of auto theft is so paramount as to supersede the longstanding history of Fourth Amendment protection against the invasion of one's own home.

Finally, I cannot accept that there was consent by Duran to the officers' search for Hernandez once they were inside—given the uncontradicted evidence that his door had just been kicked in, and all three officers had their guns drawn. I note that Gemeinhart, the lead officer and in charge of the officers' efforts to serve the arrest warrant, apparently did not believe any consent by Duran was needed. Gemeinhart testified that "after [he] had broken the door down, with enough understanding that [he] believed the subject was inside, we were going to search anyway for the subject that was wanted on the arrest warrant or that we had an arrest for." (Tr. 76).

I appreciate the majority's careful attention to precedent in reaching the result it has. However, I am deeply troubled by testimony indicating that police officers believe that when the resident of a dwelling does not open a door, after having simply heard the announcement that "police" are outside, the officers may kick in that door to gain entry. My reading of the facts presented to the trial court in this case lead me to strongly believe that Duran's motion to suppress should have been granted.